## Karns *et al. versus* Tanner.

| 66 | 297 |
| 126 | 414 |
| 66 | 297 |
| 136 | 618 |
| 66 | 297 |
| 140 | 386 |

| 66 | 297 |
| 207 | s 78 |

| 66 | 297 |
| 26 SC | 74 |

1. Parker leased oil territory to Tanner. Parker took possession, alleging abandonment and forfeiture by Tanner, who afterwards died and his interest was sold by the sheriff. In ejectment by the vendee, *Held*, that Parker was not a competent witness under the Act of April 15th 1869, being "assignor of the thing," &c.

2. The proviso of the act contemplates that the deceased shall be the assignor of the thing, &c., and that the thing, &c., shall be the subject of the action.

3. When a party to a thing or contract in action is dead and his rights have passed by his own act or the law to another who represents his interest, the surviving party shall not testify to matters occurring in the life of the adverse party.

4. The declarations of an agent employed to sink a well are not evidence of the reasons of the principal for ceasing to operate.

5. Abandonment of the lease was a question of intention and was for the jury.

6. Tanner went into possession under the lease and ceased operating. If he had not abandoned, Parker ousted him wrongfully and ejectment would lie, notwithstanding the grant under the lease may have been an incorporeal interest.

October 17th 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Armstrong county:* No. 67, to October and November Term 1870.

This case was an action of ejectment brought by James P. Tanner against S. D. Karns, John Karns, Fullerton Parker and William J. Parker, to March Term 1868.

Subsequently the plaintiff died, and June 12th 1869 Frances E. Tanner his executrix was substituted: on the 8th of March 1870, "executrix" was stricken out, and "purchaser of the interest of James P. Tanner at sheriff's sale," substituted.

The premises in controversy were "two small lots * * * on one of which an oil-well is drilled," of which the title was in Fullerton Parker, March 7th 1866. On that day he entered into an agreement with James P. Tanner, as follows:—

* * * "That the said party of the first part, in the consideration of the sum of $500, &c., and the covenants hereinafter, stated by these presents does hereby grant, &c., unto the said party of second part, his heirs and assigns, all the oil and mineral rights and privileges, to, on, in and under that certain tract of land situate in the township of Perry, county of Armstrong, &c., bounded as follows, to wit: commencing at the tan-yard run at low-water mark; thence up the river 300 feet or up to a pine tree; thence west to the public road; thence south by said road to said tan-yard run to place of beginning; also one other piece of land situate below said tan-yard from his (Parker's) line up to the tan-yard, including all below the public road to low-water mark, containing     acres, more or less.

[Karns *v.* Tanner.]

"To have and to hold, occupy, use and enjoy the said rights and privileges aforesaid, with the right of way on, to, over and into the said premises, and rights and privileges for the purpose of prospecting, boring, mining, drifting or otherwise operating for oil, coal or other minerals, and with the right of timber, stone, &c., necessary to carry out the objects of this agreement, and with the further right to erect and maintain all buildings and machinery necessary and convenient therefor, and remove the same at pleasure.

"The said second party agrees to deliver to the said first party the one-fourth part of all oil obtained on said premises, to be delivered at the tank, &c.; * * * the said second party is hereby bound under a penalty of forfeiture of the rights and privileges hereby granted, to commence operations by boring or mining within one year from the date hereof, and prosecute the same with reasonable diligence. This lease to continue for the term of fifty years."

Parker assuming that Tanner had failed to prosecute operations with diligence, and had abandoned the lease; entered as for condition broken, and on the 25th of June 1868 leased to the other defendants, who entered into possession.

The case was tried, March 17th 1870, before Buffington, P. J.

The plaintiff gave evidence of the payment of the $500 and of other expenditures for machinery, &c., to about $4000; that Tanner commenced operations in May 1866; G. W. Homer was employed by him to superintend the boring, &c.; the well was sunk about eight hundred and thirty feet, and oil found, which was shipped in November 1866.

G. W. Tanner, a son of J. P. Tanner, testified that in December 1867 his father and F. Parker had a conversation about the well, &c., at which witness and Parker's son were present; Tanner said the money market was tight; he could not spare money from his business, but in a short time he would send one of the boys up to take charge of the well; he was confident there was enough oil to make himself and Parker well off; in March 1868 proceedings in bankruptcy were commenced against Tanner; he was struck down with paralysis about July 1st 1868, and was not able to do anything until his death, April 13th 1869. The plaintiff gave other evidence of conversations between Parker and Tanner, tending to show that neither considered the lease abandoned.

They gave in evidence a sheriff's sale, May 22d 1869, of Tanner's interest in the lease to Frances E. Tanner, the plaintiff; also proceedings in bankruptcy against Tanner commenced by petition of creditors April 24th 1868, and the petition dismissed February 2d 1869, at the cost of petitioners.

The defendants gave evidence by W. Morgan that in May 1866, he was employed by Homer, the agent, to help sink the well,

[Karns v. Tanner.]

and continued until November; after testing it for two or three weeks, it turned out to be pretty near a failure. The defendants then offered to prove by the witness that he was discharged from further testing the well by Homer, the agent of Tanner, because Homer declared the well a failure, and that on that account it was no longer necessary to continue testing.

The plaintiff objected to the offer; the court allowed witness to testify that he had been discharged by Homer, but would not permit him to testify the reasons given, as not being within Homer's agency. A bill of exceptions was sealed for the defendants.

Homer remained there a short time afterwards; in March or April 1867 the derrick and all the machinery but the engine were moved to another well about two hundred rods distant; the well remained unoccupied from that time until July or August 1868, when work was commenced under defendants; they went about thirty feet deeper, when it turned out to be a good well.

E. Marshall testified that he assisted in taking down the derrick under Homer; that it, with the engine, was hauled to Parker's landing; there was nothing left on the ground.

The defendants offered Fullerton Parker, a defendant, to testify; he was objected to by the plaintiff as incompetent; was rejected and a bill of exceptions sealed.

There was evidence also in contradiction of the testimony of G. W. Tanner, and tending to show that Tanner had abandoned the lease.

The following were points of the defendants, with the answers:—

1. "The agreement of the 7th of March, A. D. 1866, between Fullerton Parker and James P. Tanner did not confer upon said Tanner any right to realty; said agreement is but a license to bore for oil and mine for coal, and under it said Tanner had and acquired thereby nothing more than a chattel interest, an incorporeal hereditament, for which no action of ejectment can be maintained, and therefore, for this reason, the plaintiff is not entitled to recover."

Answer: "This point is answered in the negative."

3. "If the jury find that the drilling of the well in question was stopped in December 1866, by James P. Tanner's agent, and that in March 1867, the derrick, engine and all fixtures were taken down and removed from the premises, and no renewal or resumption of the work took place by Tanner, Fullerton Parker had the right to regard the Tanner lease as forfeited, and to release it to other persons."

Answer: "I do not say these facts justify a forfeiture in law; they are, however, important for the jury with circumstances."

6. "The work at the well was relinquished by Tanner and his employees in November 1866, and the well was allowed to stand idle from that time till June 1868, and Tanner was notified in

December 1867, the derrick, engine, and fixtures were taken away, and Tanner declared in December 1867, he would have nothing more to do with it himself, but would send his son up next week, and neglected to do so and to take any steps towards a resumption of the work, Fullerton Parker was justified in releasing the property in June 1868, and even sooner if he had thought proper to do so."

Answer: "If all the facts in this point are true, it is for the jury to say whether there was such abandonment. This is for the jury, and is a question for the jury."

7. "The action of ejectment being in the nature of a bill of equity, before the plaintiff would be entitled to recover the jury must be satisfied that James P. Tanner performed his contract to prosecute with diligence the drilling of the well; and the jury will say whether the stopping of all work in November 1866, and suffering the well to remain idle from that time until Mr. Parker took possession of the well in June 1868, was not an unreasonable delay. Sitting as a chancellor the judge is entitled to express his opinion on the facts, and therefore to say that specific execution of the contract under all the circumstances ought not and cannot be enforced."

Answer: "I do not view this case as a bill in chancery. It is a proceeding to recover a forfeiture on condition broken, and is a proceeding at law. It is therefore answered in the negative."

The court further charged:—

* * * "The lease of the 7th March 1866, is relied upon by the plaintiff, as establishing her right of possession. Without going into an analysis of its terms, being as it is a question of law, [the conclusion the court has come to in the construction is that it is the grant of a corporeal right not only to the oil and mineral, but also to the surface of the premises described as necessarily incident to the working and enjoyment of the main object of the grant. Without the right to the possession of the surface the mineral could not be reached; and being, therefore, an exclusive right to the possession, inseparably connected with the occupation and enjoyment; and being a purchase of the lease held for a valuable consideration of $500, and rents for the term of fifty years, we deem it such a corporeal right to the occupancy of the premises as will sustain an action of ejectment; and we also think that it is a purchase and sale of an estate for years for a valuable consideration, encumbered with a rent-charge, or a rent in the nature of a rent-charge, with a clause of forfeiture upon a contingency. Such is the construction the court have put upon that agreement or lease; and if the terms of it were complied with in its tenor and spirit, the plaintiff must be entitled to recover.] This disposes of the question raised by the defendants' counsel as to the nature and character of the estate, and the

[Karns v. Tanner.]

rights whether corporeal or incorporeal contemplated by the lease, and also answers the position of the defendants' counsel, that ejectment cannot be sustained. In a word we decide that the estate was corporeal and ejectment the proper remedy." * * *

"In the succeeding spring of 1868, a bill was filed against Mr. Tanner, in bankruptcy, which continued till February 1869, when the proceedings were dismissed. I do not look upon this as being very material or controlling, as it was followed so shortly afterwards by a lease to Karns & Co., of the 25th June 1868. From that time the defendants, by their own act, entered and prevented further prosecution of the work by the plaintiff, Mr. Tanner; and they were estopped from further objections.

"How stands the matter ? [I do not think that the mere lapse of time in this case affords a sufficient ground of forfeiture.] A forfeiture is not incurred upon slight circumstances, but requires evidence of sufficient grounds and made out by clear and satisfactory means.

"[But although the mere lapse of time was in my opinion not sufficient to warrant a declaration of forfeiture or seizure of the premises, still if aided and strengthened by the acts and declarations of the tenant, Tanner, evincing an intention permanently to abandon, or to do so for any unreasonable time, it would justify the entry and forfeiture in proportion to the established facts and circumstances of abandonment. Of this the jury are the judges. There is therefore but one question for the jury, were there such acts and circumstances, or such unreasonable delay manifesting an abandonment, as justified an entry by Parker, and declaration of forfeiture. If the jury think so, the plaintiff cannot recover, but if not, the verdict should be for the plaintiff."]

The verdict was for the plaintiff, and the defendants took out a writ of error.

They assigned for error :—

1. The rejection of Fullerton Parker.

2. Rejecting the offer to prove the reasons given by Homer for discharging Morgan.

3, 4, 5 and 6. The answers to the defendants' points.

7, 8 and 9. The parts of the charge in brackets.

*S. A. Purviance* (with whom was *J. Boggs*), for plaintiffs in error.—It was for the jury to determine whether the time was sufficient to establish an abandonment: Youst v. Martin, 3 S. & R. 429. Forfeiture ensues on condition broken : Bacon's Abr. *Condition*, 307–317 ; Hamilton v. Elliott, 5 S. & R. 375 ; Walls v. Hartley, 7 Wend. 210 ; Verplank v. Wylet, 28 Id. 506 ; Coldren v. Brownwelt, 1 Johns. R. 287 ; Coke Litt. 215. Entry is not necessary : Sheaffer v. Sheaffer, 1 Wright 525 ; Davis v. Moss, 2 Id. 346. As to what constitutes a condition : Bear v. Whisler,

[Karns v. Tanner.]

7 Watts 144; Westenberger v. Reist, 1 Harris 596; Funk v. Haldeman, 3 P. F. Smith 229. A lessee out of possession must show performance of all his covenants : Kreutz v. McKnight, 3 P. F. Smith 319; Sugden on Vendors 246; Youst v. Martin, 3 S. & R. 429; Peebles v. Reading, 8 Id. 483. As to the rejection of Parker : Act of April 9th 1870, Pamph. L. 1605.

*E. S. Golden* and *W. F. Johnston* (with whom was *J. B. Neale*), for defendant in error, referred to Act of April 15th 1869, § 1, Pamph. L. 30, Purd. 1566, pl. 1. Parker was the legal assignor of the plaintiff : 2 Black. Com. 3271; Bouv. L. Dict. 133; Act of April 26th 1850, § 4, Pamph. L. 591, Purd. 366, pl. 13; Act of 1870, *supra*. The declarations of an agent out of the scope of his agency cannot affect the principal : Eakman v. Sheaffer, 12 Wright 176. Tanner's rights vested on the execution of the lease : Bortz v. Bortz, 12 Wright 382. The estate was a corporeal interest : Caldwell v. Fulton, 7 Casey 475; Hill v. Hill, 7 Wright 521; Chicago and Allegheny O. and M. Co. v. U. S. Petroleum Co., 7 P. F. Smith 83; Law v. Patterson, 1 W. & S. 184; McMahan v. McMahan, 1 Harris 383; Doe v. Bird, 11 East 49; Tyler on Ejectment 37, 39, 41, 42; Rex v. Arlesford, 1 Term R. 358; Nichols v. Lewis, 15 Conn. 137; Adams on Ejectment 19, 22; Ward v. Petifer, Cro. Car. 362; Wheeler v. Toulson, Hardress 330. The question whether the lease was forfeited was properly submitted to the jury : Youst v. Martin, 3 S. & R. 429; Gratz v. Beates, 9 Wright 495; Railroad v. Hagan, 11 Id. 248. The whole charge and the answers are to be taken together : Pierce v. Cloud, 6 Wright 102; Oakland Railway v. Fielding, 12 Id. 321. Forfeitures are odious and may be waived by silence; when waived they cannot again be asserted : Sharon Iron Co. v. Erie City, 5 Wright 342; McKnight v. Kreutz, 1 P. F. Smith 233; Lycoming Co. Ins. Co. v. Schollenberger, 8 Wright 259; Heil v. Strong, Id. 265. The forfeiture must be claimed at the time it occurs; there must be no indulgence : Forsyth v. Oil Co., 3 P. F. Smith 168; 18 Viner's Abr. 482; Bacon's Abr. *Rent*, H. ; Com. Dig. *Rent*, D 5; McCormick v. Connell, 6 S. & R. 151; Newman v. Rutter, 8 Watts 51. The burden to prove a forfeiture was on defendants : Peachy v. Somerset, 1 Strange 447; Livingston v. Tompkins, 4 Johns. Ch. 433; 1 Mitford Eq. Pl. 186; Wigram on Discovery, § 130; 1 Maddock's Ch. Pr. 173–4; 2 Story's Eq. Jur., § 1494; Wrottesley v. Bendish, 3 P. Wms. 238.

The opinion of the court was delivered, January 3d 1871, by

AGNEW, J.—By an agreement of March 7th 1866 Fullerton Parker sold and conveyed to James P. Tanner, his heirs and *assigns*, all the oil and mineral rights and privileges to, on, in and under a certain parcel of land, for the consideration of $500, reserving one-fourth of all the oil to be obtained, and binding

[Karns v. Tanner.]

Tanner, under the penalty of a forfeiture of the lease, to commence operations within one year, and prosecute the same with reasonable diligence—the lease to continue for a term of fifty years. Tanner paid the consideration, and began operations in a few weeks after the date of the lease, and sunk an oil-well to the depth of 830 feet, expending for fixtures, engine, tools, labor, &c., about $4000. The well was pumped but seemed to be unsuccessful. This was done within the first year. Tanner became embarrassed and operations ceased. The engine, fixtures, &c., were removed by Homer (who drilled the well) in the spring of 1867. The premises then remained without further operations by Tanner until the 25th of June 1868, when Fullerton Parker, believing Tanner's lease forfeited, leased the same premises to the Messrs. Karns & Co., parties to this suit. They entered into possession, drilled the well 30 feet deeper and obtained oil. Tanner was stricken with paralysis about a week after the second lease, and remained unfit for business till he died on the 13th of April 1869. This ejectment was brought by Tanner a few weeks before his death against Fullerton Parker and Messrs. Karns & Co., his lessees. After Tanner's death a sheriff's sale of his interest in the lease took place, and it was bought by Mrs. Frances E. Tanner, who was then substituted as plaintiff in this action. The main question on the trial was the alleged abandonment of the lease by Tanner and its forfeiture, on the ground that he had ceased to prosecute operations with diligence. The plaintiff, among other things, proved a conversation between Tanner and Parker in December 1867, to show that Tanner had not abandoned. On part of the defence Fullerton Parker was called as a witness to rebut the plaintiff's case and was objected to, and was rejected by the court as incompetent. This is the chief question in the cause, and involves the true meaning of the 1st section of the Act of 15th April 1869, allowing parties interested to be witnesses. The act reads thus: "No interest or policy of law shall exclude a party or person from being a witness in any civil proceeding: Provided, This act shall not alter the law as now declared and practised in the courts of this Commonwealth, so as to allow husband and wife to testify against each other, nor counsel to testify to the confidential communication of his client; and this act shall not apply to actions by or against executors, administrators or guardians, nor where the *assignor* of the *thing* or *contract in action* may be dead, excepting in issues and inquiries *devisavit vel non,* and others respecting the right of such deceased owner between parties claiming such right by devolution on the death of such owner." The judge below held that Fullerton Parker was incompetent to testify under that clause of the proviso which declared that the act shall not apply "where the *assignor* of the *thing* or *contract in action* may be *dead.*" This clause

contemplates two things; the first, that the deceased party shall be the *assignor* of a thing or contract; the second, that this thing or contract shall be the subject of the action. In a precise sense then James P. Tanner, the deceased lessee of the premises, is not the assignor of Frances E. Tanner, for he was dead before his title passed; and it passed by a sheriff's sale by act of the law. He therefore did not assign. Again, the thing in action is the right to the possession of the premises leased, this being an action of ejectment, and the contract under which this right arises is the lease from Parker to Tanner. In that lease Parker is the lessor, and may be said to be the assignor to Tanner of the thing in action, and Parker is alive. As assignor to Tanner, he seems literally not to be within the prohibition of the proviso. But is this the true meaning of the proviso? We think not. In giving to this law a proper interpretation we must recur to the evil intended to be remedied. Post *v.* Avery, 5 W. & S. 509, overturning Steele *v.* Phœnix Ins. Co., 3 Binn. 306, established the rule that a party making an assignment of his interest in the subject of the suit, to enable himself to testify for his assignee, is incompetent as a witness. This was confined to assignments termed merely colorable; but it led the way to a vast train of decisions, some of which went beyond the original case.

Thus in Graves *v.* Griffin, 7 Harris 176, a party to a contract, not the note in suit, and he not a party to the action, assigned his interest in the contract and was then offered by the defendants to prove that the plaintiffs had agreed that the note in suit should be applied in payment of his contract. It was held that by the doctrine of Post *v.* Avery and its successors, he was incompetent. Woodward, J., saying, "though not a party to the record, he should have been excluded, whether his assignment was real or fictitious." So it was held in·Irwin *v.* Shumaker, 4 Barr 199, that a co-defendant who was a certificated bankrupt as to whom a *nolle prosequi* was entered, and who executed a release of any surplus to his assignees in bankruptcy, was incompetent on the score of policy. Other cases lie in these lines of decision, and hence it was said in Cambria Iron Co. *v.* Tomb, 12 Wright 394, that a party to the record is incompetent as a witness on the ground of policy has become too firmly fixed to be changed as a rule of practice, except by legislation. Many attempts were made to apply this remedy, but all failed until the Act of 1869 was passed. That act laid the axe to the root of the evil, by declaring that no interest or policy of law shall exclude a party or person from being a witness in any civil proceeding. This is sweeping language, and was intended to reach every imaginable case. But the legislature knew that there were some exceptions that must be allowed, otherwise the law could not stand, for it would run counter to interests so sacred and a policy so clear, that public

[Karns *v.* Tanner.]

sentiment would not tolerate their sacrifice.   The proviso there-
fore followed, which was evidently the product of two thoughts,
one that there were certain confidential relations to be protected
against compulsory disclosure, the other that there were certain
cases of inequality where it would be unjust to open a door to one
party, that was closed by necessity against the other.   Hence the
proviso declared that husband and wife should not be permitted to
testify against each other; nor counsel to testify to the confidential
communications of his client.   This belongs to the first thought,
the confidential relation.   It then declared that the act should
not apply to actions by or against executors, administrators or
guardians, nor where the assignor of the thing or contract in
action may be dead.   This evidently came from the second thought,
as to the inequality of the parties.   Where one of two parties to a
transaction is dead, the survivor and the party representing the
deceased party, stand on an unequal footing as to a knowledge of
the transaction occurring in the lifetime of the deceased.   The
enacting clause had opened the lips of all parties, but when death
came it closed the lips of one, and evenhanded justice required the
mouths of both to be sealed.   In regard to one class we easily
comprehend that a survivor ought not to be permitted to testify
against the executor or administrator of his adversary, but as to
the other class in the same clause, we do not so readily perceive
what *assignor* it is, who being dead the proviso closes the mouth
of the survivor.   Evidently it is the true purpose of the proviso
to close the mouth of him who is adversary to the deceased assignor.
Here the current of former decisions tends to elucidate the mean-
ing of the legislature.   If, therefore, the holder of a note, bond
or other contract should assign his interest to another, he was
held to be incompetent to support the claim by his testimony
against the opposite party in the instrument or contract.   Hence
although he had been stripped of all apparent interest by his
assignment or by the operation of the bankrupt law, yet he could
not testify against the adverse party.   One of the reasons given
by Woodward, J., in Graves *v.* Griffin, *supra*, is that whilst one
of the parties to a contract in litigation is denied the privilege of
testifying, the policy of the law is to close the mouth of the other,
and this whether it relates to a claim of a plaintiff, or a set-off of
a defendant.   The true spirit of the proviso then seems to be that
when a party to a thing or contract in action is dead, and his
rights have passed, either by his own act or by that of the law, to
another who represents his interest in the subject of controversy,
the surviving party to that subject shall not testify to matters
occurring in the lifetime of the adverse party, whose lips are now
closed.

This intent is gathered also from the coupling of the provision
for the assignor who is dead, with the provision for the case of an

16 P. F. SMITH—20

[Karns *v.* Tanner.]

executor or administrator, evidencing that the legislature looked upon both cases as precisely alike. Another clue to the meaning is found in the exception to the proviso found in the last clause; excepting all " issues and inquiries of *devisavit vel non* and others respecting the right of such deceased owner between parties claiming such right by devolution on the death of such owner." Thus parties claiming under the same decedent, by the mere operation of the law devolving the estate upon them, as by descent or succession, are exempted from the prohibition of the proviso, in contrast to those who stand in adversary relation by reason of a subject of contract, one side of which has come from one of the original parties to the disputed subject.

The true intent of the legislature is further developed by the Act of 9th April 1870, declaring " that in all actions or civil proceedings in any of the courts of this Commonwealth, brought by or against executors, administrators or guardians, or in actions where the assignor of the thing or contract in action may be dead, no interest or policy of law shall exclude any party to the record from testifying to matters occurring since the death of the person whose estate, through a legal representative, is a party to the record." Here the terms " since the death of the person whose estate *through a legal representative* is a party to the record," are striking, for both classes are linked together in the same clause, and the terms *through a legal representative,* applied to the case of a deceased assignor as well as to the case of an executor or administrator, evincing the intention of the legislature not to confine the term assignor to one who has by his own act merely transferred his title, but rather to treat the correlative term assignee just as the term assignees is oftentimes used, in a broad sense, including any one taking title by a sheriff's sale, an Orphans' Court sale, or even a devise under a will. Thus, in the present case, though Tanner died without making an assignment himself, yet he and Parker were the parties to the contest arising upon the lease, a contest now between Mrs. Tanner and Karns & Co. Mrs. Tanner now represents that side of the controversy which her deceased husband, and predecessor in the title, once represented. ·Parker is the survivor of the parties to that controversy, and liable to his second lessees on his covenants in his lease, as well as entitled to one-eighth of the oil to be derived from it. If he be admitted to testify to matters occurring in the lifetime of Tanner, between him and Tanner, it is obvious the very case in the view of the legislature would arise and he would hold a position of advantage which would be unfair to Mrs. Tanner, who knows nothing of the transactions between them, and must therefore suffer from any one-sided narration he might give. We think the court committed no error in excluding Parker as a witness.

[Karns v. Tanner.]

The remaining assignments of error need no extended notice. The court properly rejected Homer's declarations, so far as they were offered to impute to Tanner an intention to abandon the lease. Homer was only employed to operate for oil, and no authority beyond this was shown. Having drilled 830 feet, and pumped unsuccessfully, he might well suppose the prospect of finding oil bad, and quit work and discharge the hands. But this gave him no authority to commit Tanner to an abandonment of his lease. Tanner had paid $500 for the lease, and though not willing to operate further himself, and might even sell his engine, derrick and tools, and yet be desirous of selling out to assigns, as the terms of the lease permitted, or of operating through an under tenant, who would supply the machinery, &c. Having expended $4500 in the undertaking, it is not very probable he would abandon the lease voluntarily and lose everything. Now without very clear authority to Homer to commit him to such an abandonment, the evidence of Homer's declarations would be clearly incompetent.

In regard to the forfeiture, as the work had been begun promptly and prosecuted diligently, at great expense, to the depth of 830 feet, and as the whole question as put to the jury was one of due diligence after that, and depended on a variety of circumstances, it was clearly one of fact for the jury. Abandonment of the lease was a question of intention, and was to be determined only on an investigation of facts. The court was right, therefore, in submitting it to them.

The other question, whether ejectment was the proper remedy, was placed in the argument upon the ground that the right conferred by the lease was incorporeal, and not the subject of this action. But the question as to the nature of the interest vested by the lease is not necessary to the decision of the right to maintain ejectment in this case. This is an action brought for wrongful ouster from actual possession, as it is alleged.

By the terms of the lease Tanner was entitled not only to the right of boring for oil and mining, but " to hold, *occupy, use and enjoy* with this right, and also the right of way, the rights and privileges for the purpose of prospecting, boring, mining, drifting or otherwise operating for oil, coal and other minerals," and with the further right " to erect and maintain all buildings and machinery necessary and convenient therefor, and to renew the same at pleasure." Now in order to bore for oil and to pump and take the oil, it is well understood that the party must have the actual possession of so much land as is necessary for his engine-house, derrick, tanks and machinery, and to operate them conveniently ; and this possession must continue so long as the party draws oil from the well. The evidence is clear that Tanner had gone into actual possession under the lease, and had been operat-

[Karns *v.* Tanner.]

ing there.  If his lease had not been forfeited, it is clear that the entry on him by Parker's second lessees was wrongful.  It was in just such a case, and under a writing that was clearly nothing but a license, it was stated by Justice Strong as the opinion of the court in Dark *v.* Johnston, 5 P. F. Smith 170, that an entry upon the tenant was unlawful, and we should feel ourselves justified in sustaining an ejectment to restore a possession unlawfully taken away.  The authorities cited by the defendant in error lead in the same direction.  The possession taken under the lease was actual though qualified, but still essential to prosecute the purposes of the lease, and when given to effectuate even incorporeal rights is still a substantial possession, and therefore the proper subject of this remedy by ejectment; otherwise a party might be actually ejected from a valuable oil-well or mine, with no remedy for the injury but the unsatisfactory valuation of a jury of his damages for rights prospective as well as present.  Possession to a qualified extent is essential to the enjoyment of his rights, and the law therefore must restore him to his actual place on the land, and this can be done only by an ejectment.

Upon the whole case finding no error, the judgment is affirmed.